UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

FRANCIS SANTIAGO, on behalf of himself and all
others similarly situated,

Civil Action No. 01-4048

Plaintiff,

vs.

GMAC MORTGAGE GROUP, INC., GMAC
RESIDENTIAL HOLDING CORP., and GMAC
MORTGAGE CORPORATION

Defendants.

PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................... iii

PRELIMINARY STATEMENT ................................................. 1

STATEMENT OF FACTS ...................................................... 4

ARGUMENT ................................................................. 5

I.    PLAINTIFF'S RESPA CLAIM SHOULD BE SUSTAINED BECAUSE
      IT FOLLOWS HUD's INTERPRETATION OF SECTION 8(b) ............ 6

      A.    RESPA Section 8(b) And Other Relevant Provisions ................ 6

      B.    This Court Is Bound To Defer To An Agency
            Interpretation Of A Federal Statute When Congress
            Has Delegated Interpretative Authority To The Agency
            And The Agency's Interpretation Is Not Inconsistent With
            The Statute's Purpose ........................................... 8

      C.    HUD's Interpretation Of Section 8(b) Does Not Violate
            Congressional Purpose ....................................... 13

      D.    RESPA's Legislative History Prohibits Defendants' Abusive
            Settlement Practices ........................................ 14

      E.    Plaintiff's RESPA Claim Accords With HUD's Interpretation
            of Section 8(b) ............................................. 16

      F.    Boulware Is Wrong Because It Flouts The Supreme Court's
            Directive On Deference To Agency Interpretation Of Statutes ........ 19

      G.    The Adverse Seventh Circuit Cases Interpreted Section 8(b)
            Before HUD Exercised Its Delegated Authority To Interpret
            The Statute, So The Cases Are No Longer Valid ................. 23

      H.    Recent District Court Decisions Interpreting Section 8(b)
            Support The Analysis Of The HUD 2001 Statement Of Policy ....... 25

        I.     In The Alternative, Even If The Court Undertakes A
                Chevron "Ambiguity" Analysis Of Section 8(b),
                HUD's Interpretation Should Be Upheld . . . . . . . . . . . . . . . . . . . . . . . 28

   II.   EVEN APART FROM HUD'S INTERPRETATION,
        PLAINTIFF'S RESPA CLAIM FITS WITHIN SECTION 8(b) . . . . . . . . . . . . . 29

        A.    Plaintiffs MarkUp Claims Involve Two Settlement
              Service Providers That Apportion The Charge . . . . . . . . . . . . . . . . . . 29

        B.    Defendants' Interpretation Of Section 8(b) To Require
              Two Providers Is Strained . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

  III.  PLAINTIFF HAS STANDING TO MAKE CLAIMS AGAINST
        ALL THREE DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

  IV.  PLAINTIFF'S STATE LAW CLAIMS SHOULD BE SUSTAINED . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES

### CASES

Abdille v. Ashcroft,
  242 F.3d 477 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Annulli v. Panikkar,
  200 F.3d 189 (3rd Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Barnhart v. Walton,
  122 S.Ct.1265(2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

Biustrom v. Trust One Mortgage,
  178 F.Supp.2d 1183 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Bloom v. Martin,
  865 F.Supp.1377(N.D.Cal. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Boulware v. Crossland Mortgage Corp.,
  291 F.3d 261 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18, 19, 21, 32

Bruce v. First Federal Savings & Loan Assn.
  837 F.2d 712 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Campbell v Machias Savings Bank,
  865 F. Supp. 26 (D. Maine 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Chevron U.S.A. Inc. v. Natural Resources Defense Council,
  467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,20,28, 26

Christakos v. Intercounty Title Co.,
  196 F.R.D.496(N.D.Ill. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Christensen v. Harris County,
  529 U.S.576(2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Culpepper v. Inland Mortgage Co.,
  132 F.3d 692 (11th Cir. 1998), rehg denied, 144 F.3d 717 (1998) . . . . . . . . . . . . . . . . . 23

Culpepper v. Irwin Mortgage Co.,
  253 F.3d 1324 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Duggan v. Independent Mortgage Corp.,
670 F.Supp.652(E.D.Va.1987) · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 26

Durr v. Intercounty Title Co.,
14 F.3d 1183 (7th Cir. 1994) · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 32, 27, 27

E.I. du Pont de Nemours & Co. v. Commissioner of Internal Revenue Serv.,
41 F.3d130(3d Cir.1994) · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 11

Echevarria v. Chicago Title & Trust Co.,
256 F.3d 623 (7th Cir. 2001) · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 23,24

Ford Motor Co. v. McCauley,
264 F.3d 952 (9th Cir. 2002), · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 36

Genesis Bio-Pharmaceuticals, Inc. v. Chiron Corp.,
27 Fed. Appx. 94 (3d Cir. 2002) · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·..... 34

Glover v. Standard Federal Bank,
283 F.3d 953 (8th Cir. 2002), · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 13

Ham v. Bank of America,
No. 4:01-CV-1146 (E.D. Mo. Mar. 29, 2002) · · · · · · · · · · · · · · · · · · · · · · · · · · · 2,27

Heimmermann v. First Union Mortgage Co.,
No. 99-14066, 2002 U.S. App. LEXIS 19596 (11th Cir. Sept. 18, 2002) · · · · · · · · · · · Passim

Kelly v. Wauconda Park District,
801 F.2d 269 (7th Cir. 1986) · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 32

Kellytown Co. v. Williams,
426 A.2d 663 (Pa. Super. Ct. 1981) · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 34

Krzalic v. Republic Title Company,
No. 01C 9979, 2002 U.S. Dist. LEXIS 8832 (N.D. Ill. May 17, 2002) · · · · · · · · · · · · · · 27

Lucas v. Gulf & W. Indus. Inc.,
666 F.2d 800 (3d. Cir. 1981) · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 34

Lumax Industry Inc. v. Aultman,
669 A.2d 893(Pa.1995) · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 34

MCI Telecommunciation Corp. v. Bell Atlantic-Pa.,
   271 F.3d 491 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Martinez v. Weyerhaeuser Mortgage Co.,
   959 F. Supp. 1511 (S.D. Fla. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

McCulloch v. Great Western Bank,
   No. C97-1422,1998 U.S. Dist. LEXIS 8226 (W.D. Wash. Feb. 11, 1998) . . . . . . . . . . 25,26

Mercado v. Calumet Federal Savings & Loan Association,
   763 F.2d 269 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 26

Miners, Inc. v. Alpine Equipment Corp.,
   722 A.2d 691 (Pa. Super. Ct. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Peacock v. Lubbock Compress Co.,
   252 F.2d 892 (5th Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Philadelphia Eagles Football Club, Inc. v. City of Philadelphia,
   758 A.2d 236 (Pa. Commw. Ct. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Robert Wood Johnson University Hospital v. Thompson,
   297 F.3d 273 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ... 10

Schimmelpenninck v. Byrne,
   183 F.3d 347 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

State Farm Mutual Automobile Insurance Co. v. Makris,
   Civil Action No. 01-5351, 2002 U.S. Dist. LEXIS 7567 (E.D.N.Y. Apr. 29, 2002 ) . . . . . . . 5,6

State v. Citta,
   625 A.2d 1162 (N.J. Super. Ct. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Sultan Chemists, Inc. v. United States Environmental Protection A . ncy,
   281 F.3d 73 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

United States v. Fisk,
   70 U.S.445(1865) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

United States v. Gannon,
   684 F.2d 433 (7th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 25, 26, 30

United States v. Mead Corn.,

533 U.S. 218 (2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 13, 29

United States v. Smeathers,
884 F.2d 363 (8th Cir. 1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Walton v. Apfel,
235 F.3d 184 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Weiner v. Bank of King of Prussia,
358 F.Supp.684(E.D.Pa.1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Willis v. Quality Mortgage USA, Inc.,
5 F. Supp. 2d 1306 (M.D. Ala. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## STATUTES, REGULATIONS AND
## LEGISLATIVE MATERIALS

12 U.S.C.S.§ 2601  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

12 U.S.C. § 2601(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

12 U.S.C. §2602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

12 U.S.C. § 2607 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1,6

12 U.S.C. § 2617(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,20

28 U.S.C. §1367(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

24 C.F.R. § 3500.14(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

66 Fed. Reg. 53,052 (Oct. 18, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

120 Cong. Rec. 6587 (Mar. 13, 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

H.R.Rep.No.93-1177(1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

S. Comm. Rep. No. 93-866 (1974),
reprinted in 1974 U.S.C.C.A.N. 6548 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,16

## PRELIMINARY STATEMENT

**This case** deals with Defendants' practice of charging home buyers marked-up or otherwise excessive fees for "settlement services" provided in connection with the closing of their home mortgage loans. Permissible charges for such services are governed by Section 8 of the federal Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607, which includes prohibitions against kickbacks in subsection (a) (not at issue in this case) and against "unearned fees" in subsection (b) (marked-up and excessive fees). Plaintiff claims that Defendants routinely overcharge borrowers for these services at a time when the borrowers are in no position to resist: at the closing of their home loans. According to Freddie Mac, the quasi-governmental agency charged with making home ownership more affordable, home buyers are cheated out of between $400 and $650 per closing as a result of lenders' collection of these "unearned fees." Additionally, Freddie Mac has determined that for every $400 increase in closing costs, 70,000 Americans lose the ability to purchase a home. This proposed class action seeks redress for the injuries suffered by those who have been able to purchase homes under these circumstances.

Congress enacted RESPA in 1974 to protect consumers from abusive practices in the home mortgage industry. The legislation expressly provided that the United States Department of Housing and Urban Development ("HUD") was empowered to interpret the language of RESPA and establish policies and regulations governing mortgage settlement services. HUD has exercised this express delegation of interpretative authority over the years, notably in connection with disputes concerning marked-up or excessive settlement charges under Section 8(b), the statute at issue in this litigation.

Consumer class actions challenging lenders' mark-ups of settlement charges under Section 8(b) have met with mixed outcomes in the courts. Some courts have resolved the cases

by deferring to the agency interpretations of the statute, following the precedents mandating such deference when Congress has expressly delegated interpretative authority. See e. , United States v. Mead Corp., 533 U.S. 218 (2001), and Barnhart v. Walton, 122 S. Ct. 1265 (2002). In the case of mark-ups of settlement charges, HUD had consistently interpreted the statute to prohibit mark-ups, regardless of whether the mark-up amount was retained by the lender alone, or split with another service provider. Other courts took a very different approach, concluding that the "plain language" of Section 8(b), in the phrase "portion, split, or percentage of any charge," requires that the marked-up portion itself be split between the lender and another provider, in order for there to be a violation. Prior to 1991, the only relevant Circuit Court authority on Section 8(b) was a line of Seventh Circuit decisions, culminating in Echevarria v. Chicago Title & Trust Co., 256 F.3d 623 (7th Cir. 2001), which rejected the then-current HUD interpretation of Section 8(b) and took the latter position that the overcharge itself must be split. But the Echevarria court implied it might reach the opposite result if HUD formalized its interpretation.

HUD eventually addressed this issue in a pronouncement issued in October 2001, the "2001 Statement of Policy." It explicitly disagreed with Echevarria, finding that the lender's retention of the marked-up portion of the fee violated the statute without any further splitting of the mark-up. The statement noted the Echevarria court's assertion that HUD had not previously made a "formal commitment" to a position on this subject. The 2001 Statement of Policy was formally issued as a HUD rule.

Since the 2001 Statement of Policy, reported decisions on Section 8(b) have been issued in only three cases.

In Haug v. Bank of America, N.A., No. 4:01-CV-1146 CAS, slip op. (E.D. Mo. Mar. 29, 2002), plaintiffs complained that their lender obtained marked-up unearned fees for credit,

appraisal, and document services. The court rejected defendant's reliance on Echevarria and

deferred to the 2001 Statement of Policy, holding that the mark-ups violated Section 8(b). That

decision is now on appeal to the Eighth Circuit. HUD and the Department of Justice and the

National Association of Consumer Advocates have filed amicus briefs supporting plaintiffs'

position.

Krzalic v. Republic Title Co., No. 01 C 9979, 2002 U.S. Dist. LEXIS 8832 (N.D. Ill. May

16, 2002), presented the district court within the Seventh Circuit with a mark-up dispute

following issuance of the 2001 Statement of Policy. In a very brief analysis, the court

acknowledged that Echevarria implied that the Seventh Circuit would overrule its prior position

if HUD made a formal commitment to its position, but then held that the 2001 Statement of

Policy did not qualify because it was "not subjected to the notice and comment requirements for

formal rulemaking."  2002 U. S. Dist. LEXIS 8832 at *5. The United States Supreme Court has

expressly rejected that analysis. Seven months ago, in Barnhart, the Supreme Court repeated its

long-standing position set out in Mead and Chevron, that agency policy statements may be

binding without notice and comment procedures. This is particularly true when the statute in

question expressly delegates the regulatory agency authority to make interpretations with the

force of law.  Krzalic is on appeal to the Seventh Circuit and is scheduled for argument on

November 1, 2002. HUD and the Department of Justice will argue as amicus for plaintiffs'

position.'

'  This decision also reveals the industry's full position on the 2001 Statement of Policy:
the statement is owed deference when it speaks about Section 8(a), finding that yield spread
premium cases are not suitable for class action treatment; but the same statement has been
promulgated too informally with respect to Section 8(b), which would make lenders liable for a
much broader range of marked-up and excessive settlement charges.

Boulware v. Crossland Mortgage Corp., 291 F.3d 261 (4th Cir. 2002), is the only appellate court decision on Section 8(b) issued after the 2001 Statement of Policy. It is again a mark-up case. Engaging in tortuous linguistics, the court found that the "plain language of § 8(b) makes clear that it does not apply to every overcharge," but only to cases of split overcharges. Finding no ambiguity in Section 8(b), Boulware rejected HUD's 2001 Statement of Policy. This approach is also insupportable in light of the Supreme Court's decision in Barnhart, just two months before Boulware, strongly criticizing the Fourth Circuit for undertaking a "plain language" interpretation of a Social Security statute instead of deferring to the agency's experience and expertise. The Barnhart Court's refrain that the Fourth Circuit's "linguistic point is insufficient" could easily be repeated in Boulware.

The complexity of the argument and the importance of competing interests demonstrated by the discussion above underscore the importance of this Court's careful and independent review of the language of Section 8(b); the express statutory grant of congressional authority to HUD to interpret the statute and regulate mortgage settlement service charges; the unambiguous language of the 2001 Statement of Policy and regulations, which reject the restrictive position taken by Defendants; the legislative purpose behind RESPA; prior court decisions on these issues; and the congressionally recognized need to protect consumers from past and future abusive practices by lenders in levying excessive charges for settlement services. This Court should deny Defendants' motion to dismiss and allow this litigation to continue on the merits.

## STATEMENT OF FACTS

Plaintiff financed his purchase of a home in Provo, Utah, through Defendant GMAC Mortgage Corp., located in Horsham, Pennsylvania, in a transaction that closed in late January 2002. As shown on the "HUD-1" Settlement Statement (attached as Exhibit C to Defendants'

motion), Plaintiff paid fees to Defendant for three items at issue here: Flood Certification ($20), Tax Service ($85), and Funding ($250). Plaintiff alleges that Defendants contracted with third-party vendors to actually perform the document prep, flood certification, and tax services or, in the case of "funding" (loan underwriting), performed such services in-house.  1139, 40, 45.? Defendants marked-up their contract cost for the first three services to arrive at the amounts charged Plaintiff, and charged an unreasonable or marked-up amount for in-house underwriting services. Id.  Defendants violated RESPA Section 8(b) by retaining the excessive amounts, which are "unearned fees" under the statute.

In performing underwriting services, Defendants usually either pay Fannie Mae or Freddie Mac a $20 per-loan fee to use those agencies' automated underwriting software, or use their own underwriting software.  145.  Even if Defendants use their own automated software to connect with the Fannie Mae or Freddie Mac systems, the charge of $20 per loan established by those agencies reflects the reasonable value of such services. The charge to Plaintiff was well over ten times that amount, and charges sometimes reach up to 25 times Defendants' actual underwriting costs. Id. Indeed, Defendants now charge borrowers more for automated underwriting (which takes minutes) than they charged when underwriting was performed manually (which may have taken weeks). Id. Defendants' profits from these services provided to class members appear to reach hundreds of millions of dollars.

## ARGUMENT

On a motion to dismiss, the "court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the Plaintiff."  State Farm Mut. Auto. Ins. Co. v. Makris, Civil Action No. 01-5351, 2002 U.S. Dist. LEXIS 7567, *9 (E.D.N.Y. Apr. 29,

refers to paragraphs of the Class Action Complaint dated June 21, 2002.

2002 ) (Padova, J.) (citing Angeelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir.

1985).  A Rule 12(b)(6) motion to dismiss will be granted only if "a Plaintiff cannot prove any

set of facts, consistent with the complaint, which would entitle him or her to relief." Id. (citing

Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988)).

I.    PLAINTIFF'S RESPA CLAIM SHOULD BE SUSTAINED
      BECAUSE IT FOLLOWS HUD'S INTERPRETATION OF SECTION. 8M

      A.    RESPA Section 8(b) And Other Relevant Provisions

In 1974, Congress explicitly found that "significant reforms in the real estate settlement

process" were needed "to insure that consumers throughout the Nation" are, among other things,

"protected from unnecessarily high settlement charges caused by certain abusive practices that

have developed in some areas of the country." RESPA Section 2,12 U.S.C. § 2601(a)

(Congressional findings and purpose). The legislation includes disclosure requirements, such as

the uniform settlement statements used in home mortgage closings since then; and substantive

restrictions on such matters as escrow deposit accounts and charges for settlement services -- the

latter being the provision at issue in the present litigation.

RESPA Section 3, 12 U.S.C. § 2602, defines "settlement services" to include "any service

provided in connection with a real estate settlement," including preparation of documents, the

rendering of credit reports or appraisals, loan processing, and many other services that are

enumerated as examples. There should not be any dispute in this case that the property tax,

flood, and underwriting services at issue fall within the statutory definition, and that Defendants

are "settlement service providers" (an undefined but widely used term).

RESPA Section 8, 12 U.S.C. § 2607, is titled "Prohibition against kickbacks and

unearned fees." It contains two prohibitory subsections:

(a)    Business referrals.

No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

Splitting charges.

No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

The following subsection (c) provides, in pertinent part:

(c)    Fees, salaries, compensation, or other payments.

Nothing in this section shall be construed as prohibiting . . . (2) the payment to any person of a bona fide salary or compensation or other payment for. . . services actually performed[.]

Subsection (d) provides for a joint and several civil liability of persons who violate the prohibitions or limitations of Section 8 to persons charged for the settlement service involved in the violation "in an amount equal to three times the amount of any charge paid for such settlement service."

Finally, Section 19, 12 U.S.C. § 2617, expressly delegates authority to HUD, providing:

(a)    Issuance of regulations; exemptions

The Secretary is authorized to prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of this Act.

Congress enacted RESPA in 1974 to protect consumers from abusive practices in the home mortgage industry. The legislation expressly provided that the United States Department

of Housing and Urban Development ("HUD") was empowered to interpret the language of

RESPA and establish policies and regulations governing mortgage settlement services. HUD has

done so, including by issuing a Statement of Policy (the "2001 Statement of Policy") providing

that Section 8(b) prohibits all unearned fees, including cases in which:

> [O]ne settlement service provider marks-up the cost of services performed or
> goods provided by another settlement service provider without providing
> additional actual, necessary, and distinct services, goods, or facilities to justify the
> additional charge; or ...

> [O]ne settlement service provider charges the consumer a fee where no, nominal,
> or duplicative work is done, or the fee is in excess of the reasonable value of the
> goods or facilities provided or the services actually performed.

66 Fed. Reg. 53,052, 53,093 (Oct. 18, 2001) (attached hereto as Ex. A). This statement has been

codified as a regulation and carries the full force of law.

> B.    This Court Is Bound To Defer To An Agency
>        Interpretation Of A Federal Statute When Congress Has
>        Delegated Interpretative Authority To The Agency And The
>        Agency's Interpretation Is Not Inconsistent With The Statute's Purpose

The current approach of the U.S. Supreme Court and the Third Circuit in interpreting

federal statutes is to immediately examine whether Congress explicitly delegated interpretative

authority to a federal agency -- in which case the court will not even begin to undertake its own

exegesis of the statutory language. Once the court determines that an effective interpretative

delegation to an agency has been made, the court defers to the agency's interpretation, and will

upset that interpretation only if it is found to be manifestly contrary to the statute, impermissible

under the statute, or violative of congressional intent. Accordingly, although the underlying

principles long known from Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467

U.S. 837 (1984), still apply, interpretation of a statute for which interpretative authority has been

delegated to an agency now begins with the agency's interpretation, to which deference must be

given, and not with the court's assessment of ambiguity or the court's own "plain language"

interpretation.

This approach is stated plainly in Barnhart v. Walton, 122 S. Ct. 1265 (2002), the

Supreme Court's most recent word on this subject.  While paying homage to the Chevron

principles, the Court began with the agency's interpretation and stated its (the judicial) task to be

to decide "(1) whether the statute unambiguously forbids the Agency's interpretation, and, if not,

(2) whether the interpretation for other reasons, exceeds the bounds of the permissible."   Id. at

1269, citing Chevron and United States v. Mead Corp., 533 U.S. 218 (2001). The latter decision

describes the process this way:

> We hold that administrative implementation of a particular
> statutory provision qualifies for Chevron deference when it appears
> that Congress delegated authority to the agency generally to make
> rules carrying the force of law, and that the agency interpretation
> claiming deference was promulgated in the exercise of that
> authority.

Id. at 226-27. Once delegation is shown, deference is accorded to the agency interpretation

unless it is "manifestly contrary to the statute." Id In fact, much of the recent decisional

precedent in this area deals with situations in which the delegation of interpretative authority was

only implicit or otherwise murky, and the court was required to decide whether that was enough

to warrant deference. See  id. at 228.

These principles seem almost unexceptionable, but that should not obscure the fact that

many courts have nevertheless flouted the rule of deference to agencies when interpretative

authority has been delegated, and have instead substituted their own statutory interpretations.

The courts in those situations without exception find that the "plain language" of the statute

allows only one interpretation (the court's); and that the agency's differing interpretation must be

rejected as clearly contrary to the statute. That is precisely what happened in Barnhar~ where the Fourth Circuit's interpretation of the disability provisions of a Social Security statute, which the court insisted was mandated by the statute's "plain language," was unanimously reversed by the Supreme Court. Barnhart, 122 S. Ct. at 1268-69. Seen from that perspective, times definitely have changed since Chevron. Now the agency's interpretation is given primary and presumptive effect and the court's role is limited to being sure that the congressional purpose is not violated?

The Third Circuit authority is consistent. In Robert Wood Johnson University Hospital v. Thompson, 297 F.3d 273 (3d Cir. 2002), involving interpretation of provisions of the Medicare statutes, plaintiff urged the court to be "indifferent" to the agency's interpretation, but the court rejected that position, going directly to the question of whether "there is adequate indication of congressional intent in the statute to demonstrate substantial delegation of authority to the Secretary" - while ignoring questions of whether the statute was clear or ambiguous in the court's own view. Id. at 281. Finding that "Chevron deference applies `when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority," id. at 281, quoting Mead, 533 U.S. at 226-27, the court applied the agency's interpretation. Only after finding Chevron deference did the court look to the statute itself.'

3 In Boulware, the Fourth Circuit has made exactly the same mistake in its decision interpreting the "plain language" of RESPA Section 8(b) to prohibit only "split" settlement service overcharges, in the face of the agency decision to the contrary, as described more fully below. The similarity of the Fourth Circuit's approaches in Walton v. Apfel, 235 F.3d 184 (4th Cir. 2000), rev'd sub nom. Barnhart, 122 S. Ct. 1265, and Boulware is uncanny; and it is particularly disturbing that the Boulware panel made the same mistake again only two months after the Supreme Court reversed in Barnhart.

' Other Third Circuit cases hold that where a statutory scheme expressly delegates interpretative authority to an agency, deference should be given to the agency's interpretations. See, e.g., MCI Telecommunciation Corp. v. Bell Atl.-Pa., 271 F.3d 491, 515-16 (3d Cir. 2001)

Presumptive deference to agency interpretative authority once statutory delegation to the agency is established is also the approach taken in the most recent circuit court decision on RESPA interpretation, Heimmermann v. First Union Mortgage **Corp.,** No. 99-14066, 2002 U.S. App. LEXIS 195 (11th Cir. Sept. 18, 2002). The case involved HUD's interpretation of RESPA Section 8(a), the anti-kickback provision, as it applies to yield spread premiums, and arose in the context of whether HUD's approach in assessing the legality of yield spread premiums produced individualized issues for each borrower such that a class could not be certified.  Heimmermann, 2002 U.S. App. LEXIS 19596, at *1-3. However, the underlying issue in Heimmermann -- when to defer to an agency interpretation of a statute -- is the same as in the present case, as are the agency, the delegation to the agency, and the agency pronouncement, so the decision is particularly instructive.

The Heimmermann court went directly to an analysis of whether HUD's 2001 Statement of Policy qualified as an exercise of agency authority delegated by statute. It did not undertake any threshold analysis of statutory ambiguity:

> Because the power to issue interpretations is expressly delegated in RESPA, the 2001 SOP carries the full force of law. As a result, we give deference to the 2001 SOP.

Id. at * 10. "No deference is to be given to an agency interpretation that is at odds with the plain meaning of the statute being interpreted" (citing Chevron 467 U.S. at 842-43) - again giving

("Chevron deference is warranted when the agency was given the power to make rules carrying the force of law and when the interpretation at issue was promulgated in the exercise of that authority."); Abdille v. Ashcroft, 242 F.3d 477, 484 (3d Cir. 2001) (INS board's interpretation of its own regulations is entitled to "great deference" because of the statutory "express delegation of authority"); E.I. du Pont de Nemours & Co. v. Comm'r of Internal Revenue Serv., 41 F.3d 130, 135 (3d Cir. 1994) (Treasury Secretary's interpretation upheld in light of the statute's provision that the "Secretary shall prescribe regulations," which "appears to be precisely the type of `express delegation of the authority to the agency' that Chevron contemplates" (citation omitted)).

primary effect to the agency's pronouncement, then seeing whether it violates the statute, rather than beginning with the statutory language itself. Id at *7. Moreover, <u>Heimmermann</u> is of course particularly relevant here because it involved the same agency pronouncement, HUD's 2001 Statement of Policy, that is at issue in the present case, inasmuch as the statement speaks to both yield spread premiums under Section 8(a) and overcharges for settlement services under Section 8(b).⁵

Although <u>Heimmermann</u> was issued after Defendants filed their motion, undoubtedly they will contend that it is distinguishable or inapplicable because it is a yield spread premium case involving interpretation of Section 8(a) rather than an unearned fee case under Section 8(b). But this court's decision on whether to defer to HUD's statement, according to the analysis in <u>Barnhart</u>, <u>Mead</u>, and <u>Heimmermann</u> itself, is to be based, not on the perceived "plainness" or "ambiguity" of the statutory language being interpreted, but rather on whether interpretation is delegated to the agency. Here, as the <u>Heimmermann</u> court held, and no other court has

---

⁵ Defendants make a passing argument that the 2001 Statement of Policy is entitled to deference with respect to Section 8(a), because a congressional Conference Report had asked for clarification on lender payments to mortgage brokers, but not with respect to Section 8(b), because that portion was issued "unilaterally" by <u>HUD. Def. Mem. at</u> 20-21, n.12. Although one court deferring to HUD on Section 8(a) mentioned that Conference Report request as a reason to give deference, no court has rejected deference to HUD's interpretation of Section 8(b) based on its supposedly unilateral origin, or even mentioned this as a factor.

<u>Heimmermann</u> dispositively holds that the 2001 Statement of Policy, including its pronouncements on Section 8(b), is within HUD's delegated interpretative authority and entitled to deference by courts. The court cited RESPA's express delegation of interpretative authority to HUD in Section 19, 12 U.S.C. § 2617(a), and noted that "HUD regulations identify a `statement of policy' as a document that embodies such a `rule, regulation, or interpretation' under RESPA's delegation of authority," <u>Heimmermann</u>, at *9, quoting 24 C.F.R. § 3500.4(a)(1)(ii). The court further noted that <u>Mead</u> and <u>Christensen v. Harris County</u>, 529 U.S. 576 (2000), where agency pronouncements were held not to warrant deference, did not involve agencies acting pursuant to statutory delegations of interpretative authority, whereas HUD was delegated such authority and exercised it in issuing the 2001 Statement of Policy. Id at * 10.

questioned, interpretation of Section 8, both subsections (a) and (b), is delegated to HUD pursuant to Section 19, as quoted above.'

**C.    HUD's Interpretation Of Section 8(b)
       Does Not Violate Congressional Purpose**

Under Barnhart, Mead, and Heimmermann, the agency's interpretation is not allowed to violate the purpose of the statute as stated by Congress. See Barnhart, 122 S. Ct. at 1269 (the court must decide whether the statute "unambiguously forbids the Agency's interpretation"); Mead, 533 U.S. at 227 (whether the agency interpretation is "manifestly contrary to the statute"); Heimmermann, at * 12 (whether the agency interpretation is "inconsistent with clear congressional intent").   As noted above, the Court's task in making this assessment here is easy because RESPA contains its own statement of "Congressional findings and purpose" in Section 2, 12 U.S.C.S. § 2601, one of which is to protect "consumers throughout the Nation ... from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." The interpretation given to Section 8(b) in the 2001 Statement of Policy - to prohibit both mark-ups and unreasonably excessive settlement charges, without regard to "splits" of overcharges - cannot plausibly be said to violate that statutory purpose. If

---

'   Other than the Culpenner decisions superseded by Heimmermann, judicial authority favoring deference to HUD's interpretation of Section 8(a) in the yield spread premium context has been essentially unanimous. See, e.g., Glover v. Standard Fed. Bank, 283 F.3d 953, 961-62 (8th Cir. 2002), cert. denied, No. 01-1648, 2002 U.S. LEXIS 7377 (Oct. 7, 2002), (finding that the HUD rules were "promulgated under the express authority of Congress and adjudicated with apparent congressional intent to carry the force of law," and that "the Policy Statements issued by HUD reflect a reasoned view of a responsible agency which is consistent with the statute and regulation and which constitutes a body of experience and informed judgment that this court may look to as determinative authority"); Bjustrom v. Trust One Mortgage, 178 F. Supp. 2d 1183, 1196 (W.D. Wash. 2001) ("This Court cannot conclude that the 2001 policy statement is an impermissible interpretation of RESPA.").

anything, the 2001 Statement of Policy might be said to effectuate the policy too broadly and vigorously, but there is no indication that Congress had any such limitations in mind.

Defendants argue that the use of the terms "portion, split, or percentage" in the statute prohibits HUD from seeking to rectify abuses other than overcharges apportioned among two settlement service providers.

### D.     RESPA's Legislative History Prohibits Defendants' Abusive Settlement Practices

Congress enacted RESPA to protect consumers "from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). The Senate Committee Report 93-866 (1974) on RESPA stated that the statute deals with "such problems as kickbacks, unearned fees, and unreasonable escrow account requirements [to] ensure that the costs to the American home buying public will not be unreasonably or unnecessarily inflated by abusive practices." 1974 U.S.C.C.A.N. 6548. In the Senate Committee Report's section by section analysis of RESPA, it further stated:

> Section 7. Prohibition against Kickbacks and Unearned Fees. --
>
> Subsection (a) of this section prohibits any person from giving or receiving any fee, kickback, or thing of value pursuant to any agreement that business incident to a real estate settlement involving a federally-related mortgage loan shall be referred to any person.
>
> Subsection (b) prohibits the acceptance of any portion of any charge for the rendering of a real estate settlement service other than for services actually performed.

Id. at 6556 (emphasis added).

It is significant that, in the section-by-section summary, the Senate Report makes no mention of "giving" an unearned fee, but rather describes Section 8(b) as prohibiting "the acceptance of any portion of any charge for the rendering of a real estate settlement service other

that for services actually performed," id., suggesting that Congress did not intend to require two

culpable parties for every violation.

Likewise, the House Report similarly confirms plaintiffs' interpretation of Section 8(b):

Section 106. PROHIBITION AGAINST KICKBACKS AND UNEARNED FEES

Subsection (a) of the section 106 of the reported bill would prohibit the giving or accepting by any person of any remuneration pursuant to any agreement that business incident to a real estate settlement involving a federally-related mortgage would be referred to any person.

Subsection (b) of section 106 of the reported bill would prohibit the giving or accepting of any portion of any charge made or received performing a real estate settlement service in connection with a transaction involving a federally-related mortgage loan other than for services rendered.

H.R. Rep. No. 93-1177, at 13 (1974) (emphasis added).

Additional legislative support for Plaintiffs' interpretation of Section 8(b) is found in the

March 13, 1974 Congressional Record:

Section 7 is identical to section 105 of S. 2228 and would prohibit the payment or receipt of any kickback or referral fee made for the referral of real estate settlement business. In addition, this section would prohibit any person from giving or accepting any portion of any charge made for the rendering of a settlement service unless the payment were made for services actually performed.

120 Cong. Rec. 6586, 6587 (Mar. 13, 1974) (emphasis added).

Additional portions of RESPA's legislative history clearly make a distinction between

kickbacks and unearned fees by listing them as separate and distinct evils that RESPA

proscribes:

The Committee on Banking, Housing and Urban Affairs, to which was referred the bill (S. 3164) to provide for greater disclosure of the nature and costs of real estate settlement services, to eliminate the payment of kickbacks and unearned fees in connection with settlement services provided in federally related mortgage transactions, and for other purposes....

-15-

1974 U.S.C.C.A.N. 6546, 6546 (emphasis added).

> S. 3164 would proceed directly against the problem areas pointed out above in three basic ways: (1) by prohibiting or regulating abusive practices, such as kickbacks, unearned fees, and unreasonable escrow accounts. . .

> By dealing directly with such problems as kickbacks, unearned fees, and unreasonable escrow account requirements, the Committee believes that S. 3164 will ensure that the costs to the American home buying public will not be unreasonably or unnecessarily inflated by abusive practices.

Id. at 6548 (emphasis added).

At no time did Congress intend to accept the mark-up of third-party fees or the retention of unearned fees as a permissible practice and only intend to prohibit kickbacks and referral fees. Gannon, 684 F.2d at 438 (considering legislative history as a whole, RESPA was intended to have "broader application" than kickback or split fee situation as "Congress' aim was to stop all abusive practices that unreasonably inflate federally related settlement costs"). The legislative history demonstrates that Congress' goal was to have a wide reach and ensure borrowers would not pay costs unreasonably inflated by abusive practices. Any other conclusion would mean that Congress sanctioned the secret mark-up of fees in the very statute that was enacted to combat and prevent abuses in the mortgage industry that unnecessarily inflated a borrower's settlement costs.

E.   Plaintiffs RESPA Claim Accords
     With HUD's Interpretation of Section 8(b)

Plaintiff s RESPA claim is pleaded using the exact language of the 2001 Statement of Policy defining Unearned Fees. ¶¶ 2, 36. Effective agency interpretations of a federal statute govern how the statute is applied in private civil litigation as well as in litigation involving the agency or the government. Once it is determined that HUD's interpretation of Section 8(b) in the

Statement reflects a proper delegation of authority, and that the congressional purpose is not violated thereby, the legal sufficiency of Plaintiff's RESPA claim is established.

HUD's formally promulgated regulations, 24 C.F.R. § 3500.14(c), specifies, after reciting the language of Section 8(b), that "[a] charge by a person for which no or nominal services are performed . . . is an unearned fee and violates this section." The 2001 Statement of Policy elaborates:

>        The Department also reiterates its long-standing position that it may violate Section 8(b) and HUD's implementing regulations:
>
>        (1) For two or more persons to split a fee for settlement services, any portion of which is unearned; or
>
>        (2) For one settlement service provider to mark-up the cost of the services performed or goods provided by another settlement service provider without providing additional, actual, necessary, and distinct services, goods, or facilities to justify the additional charge; or
>
>        (3)     for one settlement service provider to charge the consumer a fee where no, nominal, or duplicative work is done, or the fee is in excess of the reasonable value of goods or facilities provided or the services actually performed.

66 Fed. Reg. 53,052

>        In the first situation, two settlement service providers split or share a fee charged to a consumer and at least part, if not all, of at least one provider's share of the fee is unearned. In the second situation, a settlement service provider charges a fee to a consumer for another provider's services that is higher than the actual price of such services, and keeps the difference without performing any actual, necessary, and distinct services to justify the additional charge. In the third situation, one settlement service provider charges a fee to a consumer where no work is done or the fee exceeds the reasonable value of the services performed by that provider, and for this reason the fee or any portion thereof for which services are not performed is unearned.

> HUD regards all of these situations as legally indistinguishable, in that they involve payments for settlement services where all or a portion of the fees are unearned and, thus, are violative of the statute. HUD, therefore, specifically interprets Section 8(b) as not being limited to situations where at least two persons split or share an unearned fee for the provision to be violated.

Id. at 53,057.

> It is HUD's position that Section 8(b) proscribes the acceptance of any portion or part of a charge other than for services actually performed. Inasmuch as Section 8(b)'s proscription against "any portion, split, or percentage" . . . is written in the disjunctive, the prohibition is not limited to a split. In HUD's view, Section 8(b) forbids the paying or accepting of any portion or percentage of a settlement service - including up to 100% - that is unearned, whether the entire charge is divided or split among more than one person or entity or is retained by a single person. Simply put, given that Section 8(b) proscribes unearned portions or percentages as well as splits. HUD does not regard the provision as restricting only fee splitting among settlement service providers.

Id. at 53,058.

> A settlement service provider may not levy an additional charge upon a borrower for another settlement service provider's services without providing additional services that are bona fide and justify the increased charge. Accordingly, a settlement service provider may not mark-up the cost of another provider's services without providing additional settlement services; such payment must be for services that are actual, necessary and distinct services provided to justify the charge.

Id. at 53,059.

> The regulations also make clear that a charge by a single service provider where little or no services are performed is an unearned fee that is prohibited by the statute.... Clearly, in all of these instances, the source of the payment - whether from consumers, other settlement service providers, or other third parties - is not relevant in determining whether the fee is earned or unearned because ultimately, all settlement payments come directly or indirectly from the consumer. Therefore, a single settlement

> service provider violates Section 8(b) whenever it receives an
> unearned fee.
>
> A single service provider also may be liable under Section
> 8(b) when it charges a fee that exceeds the reasonable value of
> goods, facilities, or services provided.  HUD's regulations as noted
> state: "If the payment of a thing of value bears no relationship to
> the goods or services provided, then the excess is not for services
> or goods actually performed or provided....   Compensation that
> is unreasonable is unearned under Section 8(b) and is not bona fide
> under Section 8(c)(2).

Id. (citations and footnotes omitted). Plaintiffs' claims correspond to these provisions. Their

application clearly will render Defendants liable for the unearned fee practices challenged in the

Complaint.

F.     **Boulware Is Wrong Because It Flouts The Supreme Court's
       Directive On Deference To Agency Interpretation Of Statutes**

As the Court is aware, the Fourth Circuit differs with the above analysis in both approach

and result. See Boulware v. Crossland Mortgage Corp., 291 F.3d passim. The Fourth Circuit

started its analysis with its own interpretation of Section 8(b); found that the statute was "not a

broad price-control provision"; and refused to apply the 2001 Statement of Policy to the Section

8(b) claim at issue, which involved a mark-up by the lender of a third-party charge for a credit

report. Id. passim. Boulware's claim was the same as Plaintiff s mark-up claim here.

In reality, the Boulware court did not even purport to consider whether deference was

owed to the agency pronouncement or whether Section 8(b) is ambiguous in undertaking its

analysis; it simply quoted the statute and concluded that the "plain language of § 8(b) makes clear

that it does not apply to every overcharge for a real estate settlement service," but only in a case

"when a `portion' or `percentage' of the overcharge is kicked back to or `split' with a third

party." Id at 265. The court's approach does not withstand critical scrutiny.

First, in view of RESPA's express delegation of interpretative authority to HUD, the Boulware court should have started its analysis with the 2001 Statement of Policy and then assessed whether the Statement was inconsistent with congressional intent, rather than presenting its judicial interpretation of the statute as the first and last word. By choosing the latter course, the court not only contradicted the substantive statutory interpretation made by the agency, it flatly disobeyed the procedural directive of Congress, in Section 19, that the agency have interpretative authority. See 12 U.S.C. § 2617.

Such a direct flouting of Congress's choice evidently derived from the court's policy preferences. The Boulware court committed the sin of favoring its own view of what would be "better or more consistent with the statutory language" over the view of the agency to which Congress delegated interpretative authority. See Heimmermann at * 13. A court's substitution of its own preference of law or policy for that of the agency violates the fundamental principle of separation of powers: Congress delegated the job of interpreting its statute to the agency, not to a court. See Chevron, 467 U.S. at 865-66 ("Judges are not experts in the field .... The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones ...... ). From the first sentence of the Boulware opinion, it is evident that the court's rejection of HUD's position was animated by abhorrence of the idea of any "broad price control statute prohibiting any overcharge" for settlement services. Boulware, 291 F.3d at 263.

Second, even if one overlooks the Supreme Court's recent spanking of the Fourth Circuit for substituting its "linguistic" analysis of supposedly "plain language" of a statute for a proper

agency interpretation,' Boulware's textual analysis of Section 8(b) is shoddy. This stems from the court's use of the terms "fee" and "overcharge" interchangeably, when in fact there is a crucial difference in the court's reading of the statute as to whether the "fee" (or "charge") must be split in order for there to be a violation, versus whether the "overcharge" must be split. See, "., id. at 265. The court would limit Section 8(b) to only the latter case, even though the word "overcharge" does not appear anywhere in the statute, and the court's own semantic analysis does not support that result.

In that case, Boulware paid $65 for the credit report, of which Crossland kept $50 and gave $15 to the credit agency that furnished the report. The "fee" or "charge" was $65. The "overcharge" was $50, as the court acknowledges ("Crossland kept the $50 overcharge for itself without performing additional services," id. at 264). The fee was split but the overcharge was not. Section 8(b) talks in terms of "any portion, split, or percentage of any charge made or received for the rendering" of a settlement service. Either this language is clear that the apportionment pertains to the charge paid by the consumer, or perhaps it is ambiguous, but it plainly does not refer to apportioning the overcharge.

But to make its analysis work, the Boulware court was forced to construe the statute as applying only "when a `portion' or `percentage' of the overcharge is kicked back to or `split' with a third party." Id at 265 (emphasis added). Almost all of Section II.A. of the court's analysis proceeds in this way. This allows the court to exclude the most obvious and common violations of Section 8(b) -- lender mark-ups of services provided by others -- from the prohibitory scope of the statute, ironically because the other party does not share in the overcharge; all of that is kept

---

' See Barnhart and the discussion of how courts are not permitted to interpret statutes whose interpretation is delegated to an agency, above.

by the lender. The court's subtle and **unsupportable shift in terminology has a major impact** on the coverage of the statute and the outcome of the case before the court: because the third-party vendor did not receive a portion of the <u>over</u>charge, just a portion of the fee, no violation occurred, says the <u>court. Id. at</u> 265 n.3.

The court consistently applies this terminological sleight-of-hand except when quoting from other court's decisions, in which the judges did not engage in such a trick. Thus, the court approvingly quotes the description of Section 8(b) contained in <u>Mercado v. Calumet Federal Savings & Loan Association</u>, 763 F.2d 269 (7th Cir. 1985): "`an anti-kickback statute' which `require[s] at least two parties to share <u>fees</u>.'" <u>Boulware</u>, 291 F.3d at 266, quoting <u>Mercado</u>, 763 F.2d at 270 (emphasis added). Both in <u>Boulware</u> and in <u>Mercado</u>, two parties - the defendant lender and the third-party service vendor -- did share the fees, so one would conclude that a violation occurred, except the <u>Boulware</u> court would find no violation because the overcharges were not shared. Although in both <u>Boulware</u> and <u>Mercado</u> the lender there received a split of the fee without actually performing any services, so a violation apparently is established, <u>Boulware</u> does not confess to the contradiction. The <u>Boulware</u> court's analysis is shoddy and disingenuous.§

§ The court engages in similar misuse of the term "unearned fee" as compared to "fee": "In addition, the statute [Section 8(b)] would apply if a mortgage service provider overcharged for its services and gave a mortgage lender a portion of the unearned fee." <u>Boulware</u>, 291 F.3d at 266. Although Section 8(b) prohibits sharing fees (other than for services actually performed), not "unearned" fees, the court in this passage again insupportably implies that the unearned portion of the fee, i.e., the overcharge, must be split in order for a violation to be found.

The <u>Boulware</u> decision is also bereft of any common sense explanation for its reading of the statute. In the example in the text above, it holds that the lender that keeps the $50 and pays the credit agency only the $15 that the credit report cost does not violate the statute; but if the lender splits part of the $50 with the agency, a violation occurs. Admittedly, interpretation of the statute is no more committed to lawyers than it is to judges, but we submit that the <u>Boulware</u> interpretation is ridiculous.

A double error thus infests the decision that Defendants describe as their "leading case" (Def Mem. at 18): the Boulware court should have deferred to HUD's interpretation of Section 8(b); and in making its own interpretation of the statute, undertaken in defiance of the interpretative delegation to HUD, it reached an untenable conclusion.

G.    The Adverse Seventh Circuit Cases **Interpreted Section 8(b)** Before **HUD Exercised Its Delegated Authority To Interpret The Statute, So The** Cases Are No Longer Valid

Defendants also cite three Seventh Circuit cases in support of their effort to restrict the application of Section 8(b): Mercado v. Calumet Federal Savings & Loan Association, 763 F.2d 269 (7th Cir. 1985); Durr v. Intercounty Title Co., 14 F.3d 1183 (7th Cir. 1994); and Echevarria v. Chicago Title & Trust Co., 256 F.3d 623 (7th Cir. 2001). In each case, Defendants suggest that the court's conclusion would render Plaintiff's RESPA claim in this case legally insufficient. The short but correct answer to Defendants on this point is Heimmermann.

Prior to the Heimmermann decision last month, the Eleventh Circuit had repeatedly interpreted Section 8(a), as it applied to yield spread premiums, contrary to the way in which HUD wanted it interpreted, as revealed in a HUD 1999 Statement of Policy that the Circuit Court found to be ambiguous. See Culpepper v. Inland Mortgage Co., 132 F.3d 692, 694 (1lth Cir. 1998) (Culpepper I), reh'g denied, 144 F.3d 717 (1998) (Culpepper II); Culpepper v. Irwin Mortgage Co., 253 F.3d 1324 (1 Ith Cir. 2001) (Culpepper III).[9] The court did not find that HUD had issued any interpretative pronouncements that warranted deference and clearly resolved the issue.

---

[9] As it happened, the Culpepper courts interpreted the subsection in a way that allowed certain yield spread premium cases to be certified as class actions (a startling result in the Eleventh Circuit). HUD's interpretation, supported by the industry, would have prevented class certification by making each borrower's mortgage broker transaction subject to individual analysis to determine compliance with the statute.

In Heimmermann, the Eleventh Circuit both decided that the new 2001 Statement of Policy, issued since the previous decision, was entitled to deference; and it accordingly completely changed its prior results in the Culpepper cases to what HUD determined in the 2001 Statement of Policy. It deferred to the agency's interpretation of the statute despite its own earlier contrary interpretation. Heimmermann, 2002 U.S. App. LEXIS at * 15-16.

Exactly the same situation will apply in the Seventh Circuit with respect to Section 8(b), assuming the courts there follow Mead and give proper deference to the agency interpretation. This very outcome is in fact forecasted in Echevarria. The Seventh Circuit there declined to defer to "the statements of HUD policy contained in two opinion letters and one special information booklet that expressed HUD's intent to remove fee splitting as a required element of RESPA § 8(b)" because it was "extraordinarily reluctant to follow unofficial interpretations which the agency itself does not view as binding." Echevarria, 256 F.3d at 628-29. It concluded its opinion with: "Absent a formal commitment by HUD to an opposing position, we decline to overrule our established RESPA § 8(b) case law." Id. at 630.

HUD has now made such a formal commitment in the 2001 Statement of Policy. As described above, that statement is the type of agency pronouncement entitled to deference under Mead, Christensen, and Barnhart. In fact, the 2001 Statement of Policy is explicit throughout that it is intended to overrule Echevarria (and Culpepper) by name. See 66 Fed. Reg. at 53,052, 53,053, 53,058. According to the Seventh Circuit's own conclusion in Echevarria, that court should now overrule its established Section 8(b) case law in deference to HUD.

H.    **Recent District Court Decisions Interpreting Section 8(b)**
      **<u>Support</u> <u>The Analysis Of The HUD 2001 Statement Of Policy</u>**

Most recent District Court decisions interpreting Section 8(b) support HUD's Statement

of Policy, rejecting the Seventh Circuit line of cases in both mark-up and single-party excessive

fee situations.

In <u>McCulloch v. Great Western Bank</u>, No. C97-1422,1998 U.S. Dist. LEXIS 8226

(W.D. Wash. Feb. 11, 1998) (attached hereto as Ex. C), the complaint alleged that defendant

marked up a credit report fee in violation of Section 8(b). The court sustained the complaint,

rejecting defendant's argument that the mark-up amount itself must be split in order for a

violation to occur:

> Defendant argues that in this case no third party existed with whom
> Great Western allegedly split fees. On the facts pleaded, however,
> Credco is the third-party. The complaint alleges that Great
> Western charged $50 for a service for which it paid a third-party
> only $ 10, leaving $40 as a fee for which no or nominal service was
> performed; it thus states a claim under 12 U.S.C. § 2607(b).  Cf.
> <u>United States v. Gannon</u>, 684 F.2d 433, 435-36 (7th Cir. 1981)
>
>
> Defendant relies on <u>Durr v.</u> <u>Intercounty</u> <u>Title Co.</u>, 14 F.3d 1183
> (7th Cir. 1994), where a title company had performed deed and
> mortgage recording services for plaintiff in connection with a
> house purchase, had charged the plaintiff $8 more than it had paid
> to the Cook County Recorder of Deeds in recording fees, and had
> failed to disclose the actual amount <u>paid. Id. at</u> 1184. The court
> held that 'the district court correctly dismissed this case because
> there was no allegation that Intercounty shared the $8.00 with
> anyone' and that defendant's overcharge 'was simply a windfall it
> kept for itself.'  <u>Id. at</u> 1186. Duff's conclusion that the difference
> between the amount charged and the amount paid must be split in
> order for there to be a violation of RESPA requires the existence of
> a fourth-party; such a reading of RESPA is not justified.

McCulloch, 1998 U.S. Dist. LEXIS 8226 at *5-7.  See also Christakos v. Intercounty Title Co.,

196 F.R.D. 496, 503 (N.D. Ill. 2000) (motion to dismiss Section 8(b) claim denied where

defendant charged $52.50 for recording a release, paid $23.50 to the third parry who performed

the service and retained for itself as an unearned fee $29); Martinez v. Weyerhaeuser Mortgaie

Co., 959 F. Supp. 1511, 1521-22 (S.D. Fla. 1996) (where receipts for courier service did not

match total charged to borrowers, the "unaccounted for courier fee of $8.75 remains a valid

unexplained payment that potentially violates RESPA"). Even the Seventh Circuit, ruling in an

earlier era, accepted that obvious analysis, See Gannon, 684 F.2d at 438 (mark-up of a third-

party's charge violated Section 8(b) even though the unearned fees were not split further),[10] only

to base subsequent decisions on Mercado, a factually inapposite case." Other than in Boulware

---

[10]  In Cannon, a counterman at the county recording office accepted fees for issuing title
certificates in excess of the statutory fees. Id. at 435. The Seventh Circuit found that because the
statutory fee was for performing settlement services, the counterman's acceptance of the
additional money was an unearned fee:

> We believe a single individual can violate § 2607(b) by receiving in his official
> capacity a "charge" for the rendering of settlement services, but personally
> keeping a portion of the charge in fact for something other than the performance
> of those services.

Id. at 438. The Court also found that RESPA was not limited to preventing kickbacks:

> Although the focus of immediate Congressional concern may have been the
> splitting of fees between the recipient of the charge and unrelated third parties, the
> arrangement we view here is no less an example of an 'abusive practice' or
> imposition of an 'unearned fee,' unreasonably increasing the cost of settlement
> services to the banks, and ultimately to the public at large.

[11]  Mercado cited Gannon with approval, but found that Section 8(b) was inapplicable as
there was neither a mark-up or a fee-split. See Mercado, 763 F.2d at 270-72. Duggan v.
Independent Mortgage Co., 670 F.Supp. 652, 654 (E.D. Va. 1987) likewise did not deal with a
mark-up or even a fee-split, but with a lender's failure to honor an agreement to lock in a
borrower's interest rate.  As a result, Duggan followed Mercado and distinguished Gannon by

and the Seventh Circuit, the only contrary post-2001 Statement of Policy district court decision appears to be Krzalic v. Republic Title Company, No. 01C 9979, 2002 U.S. Dist. LEXIS 8832, at *4-5 (N.D. Ill. May 17, 2002) (relying on Mercado and Echevarria and incorrectly concluding that the 2001 Statement of Policy did not have the force of law because it was not subject to notice and comment requirements for formal rule making) (attached hereto as Ex. D). Krzalic is currently on appeal to the Seventh Circuit. This will be the first opportunity for that court to address Section 8(b) in light of the 2001 Statement of Policy. Interestingly, the Seventh Circuit denied the mortgage industry the opportunity to file an amicus brief."

The most important pending case is Haug v. Bank of America, No. 4:01-CV-1146, slip. op. (E.D. Mo. Mar. 29, 2002) (attached hereto as Ex. E), in which defendant's motion to dismiss was denied and the case is on appeal to the Eighth Circuit. The district court determined that Section 8(b) did not require a split of the overcharge between two parties, citing HUD's view that "a single settlement service provider violates Section 8(b) whenever it receives an unearned fee." Id. at 10. Presumably the Haug appeal will yield the next Circuit Court decision on whether Section 8(b) requires that a settlement service overcharge be split for a violation to occur. Amicus briefs to the Eighth Circuit by the Department of Justice and the National Association of Consumer Advocates are attached hereto as Exhibit F.

finding that the county recording official "split" the fee between his "official" and "personal" capacity. Id. at 653. Durr did not discuss Gannon but instead relied entirely on Mercado. 14 F.3d at 1186.

"Defendants also cite three pre-2001 Statement of Policy cases. Willis v. Quality Mortgage USA, Inc., 5 F. Supp. 2d 1306 (M.D. Ala. 1998) mistakenly begins its analysis with Section 8(b) rather than with HUD's interpretation. In Bloom v. Martin, 865 F. Supp. 1377, 1383 (N.D. Cal. 1994) the fees at issue were not settlement fees and RESPA was inapplicable. Campbell v. Machias Savings Bank, 865 F. Supp. 26, 31 (D. Maine 1994) dismissed plaintiffs RESPA claim on statute of limitations grounds. In addition, all three of these cases rely on the questionable analysis of the Mercado line of Seventh Circuit cases.

**I.     In The Alternative, Even If The Court
Undertakes A <u>Chevron</u> "Ambiguity" Analysis Of
<u>Section 8(b), HUD's Interpretation Should Be Upheld</u>**

Even if this Court were to set aside the Supreme Court's admonition in <u>Barnhart</u> and

undertake a linguistic analysis of Section 8(b) to determine "whether Congress has directly

spoken to the precise question at issue," <u>Chevron</u>, 467 U.S. at 842, the result would be the same.

It is impossible to conclude with any intellectual honesty that Section 8(b) is any clearer on

whether it prohibits only overcharges that are split, than Section 8(a) is on whether it prohibits

only yield spread premiums not justified by additional services performed. Both subsections are

ambiguous to the extent that answers to those questions do not readily emerge from the plain

language used by Congress. According to traditional <u>Chevron</u> analysis, if a statute speaks clearly

to an interpretative issue, courts "must give effect to the unambiguously expressed intent"; but

once a conclusion of ambiguity (or silence) is reached, deference is given to the agency

interpretation of the statute, which should be the result here. Id.

In the present case, it is readily apparent that Section 8(b) is empirically "ambiguous" if

only because a number of courts and a federal agency have differed on how the same statutory

words should be applied. Plaintiff is not aware of any situation in which a court has cited such

common sense evidence of ambiguity in making a <u>Chevron</u> analysis, but it would be appropriate

to do so here.

More philosophically, ambiguity is nearly a foregone conclusion if statutory meaning is

sufficiently unclear that litigation on the issue ensues, because the possibility of multiple

plausible interpretations of statutory text are now well accepted. In "pre- <u>Chevron</u> days, when

there was thought to be only one `correct' interpretation of a statutory text," the idea of a "single

correct meaning" for the statute was more acceptable. "But once it is accepted, as it was in

Chevron, that there is a range of permissible interpretations," courts defer to agency

interpretations even if they shift over time, so long as they are "reasonable." See Barnhart, 122 S.

Ct. at 1274 (Scalia, J., concurring). On this analysis also, Section 8(b) is ambiguous, and

deference to HUD's interpretation in the 2001 Statement of Policy is warranted."

II.    EVEN APART FROM HUD'S INTERPRETATION,
       PLAINTIFF'S RESPA CLAIM FITS WITHIN SECTION 8(b)

    Defendants' mark-ups of third-party vendor fees and Defendants' excessive in-house

charges are both prohibited under HUD's 2001 Statement of Policy, as described above. This

Court should not have to decide itself whether, in the presence of direction from HUD, it would

also interpret Section 8(b) to prohibit both types of practices. Even if such an analysis were

appropriate, the Court should conclude that mark-ups and excessive charges for in-house services

are both unlawful.

    A.    Plaintiff's Mark-Up Claims Involve Two
          Settlement Service Providers That Apportion The Charge

    In emphasizing on the first page of their brief that "Plaintiff does not allege that any

portion of these alleged overcharges was shared, split with, or kicked back to a third party"

(emphasis in original), Defendants have borrowed from Boulware the same slippery misuse of

    "Third Circuit has recently extended Chevron deference to resolve any statutory
ambiguity in favor of the enforcing agency's interpretation. In Sultan Chemists, Inc. v. United
States Environmental Protection Agency, 281 F.3d 73, 79 (3d Cir. 2002), the Third Circuit
adopted the EPA's interpretation of a federal statute it is charged with enforcing, holding the
EPA's view was "not an unreasonable interpretation." The Third Circuit, id., further held that
under, Mead, 533 U.S. 218, 121 S. Ct. at 2171,

            [e]ven if a statute's language is ambiguous, courts should defer to
            an agency's reasonable interpretation of a statute if Congress has
            explicitly or implicitly delegated to the agency the authority to
            issue an interpretation having the force of law and the
            interpretation at issue is promulgated in the exercise of that
            authority.

terminology as a means to cloak the illogic of their position. To be clear: using the same $65/$50/$15 example described above with respect to Plaintiff s mark-up claim, Plaintiff does allege that Defendants split the charge paid by the consumer ($65) between the third-parry provider, which receives no amount "other than for services actually performed" ($15), and itself, which receives an amount for no services performed ($50). This represents a split of the charge paid by the consumer, but not a split of the overcharge portion, or of the "unearned" portion of the total charge, which is retained by Defendants.

Nothing in Section 8(b) requires that there be a split of the overcharge / unearned fee for there to be a violation of the statute. The term "charge" is used, not "overcharge."

Nor does Congress's use of the word "and," viz. "No person shall give and no person shall accept... ," cause any interpretative problem in the case of Plaintiff's mark-up claim. The language is easily read to mean that both the giver and the accepter of the charge, i.e., the lender and the third-party vendor, are covered by the prohibitory initial phrase of the statute; but that the third-party vendor is then properly saved from liability since it receives payment only for "services actually performed." This analysis applies equally to Plaintiffs tax, flood, and underwriting mark-up claims.

Defendants are correct that Plaintiff does not plead that any of the overcharge portion of the excessive marked-up fee paid by the consumer was split by Defendants with the third-party vendors, because that is irrelevant to Defendants' liability with respect to marked-up charges.

This is exactly the violation recognized 20 years ago by the Seventh Circuit in United States v. Gannon, 684 F.2d at 438-39 ("The fact that appellant kept the entirety of the extra payments instead of passing a portion of them along to an unrelated third party does not, in our opinion, render his conduct less abusive or insulate him from liability under that statute.").

**B.      Defendants' Interpretation Of
          Section 8(b) To Require Two Providers Is Strained**

**Plaintiff** also claims that Defendants' collection of unreasonably high, or excessive,

charges for settlement services from consumers violates Section 8(b), even if the charges are not

split with any vendor or other service provider or person. As described above, this interpretation

of Section 8(b) is the same as HUD's, which must be afforded  Barnhart  deference because

interpretative authority was expressly delegated to the agency and no congressional purpose is

violated by that construction, and traditional  Chevron  deference because the statute is

ambiguous. Again, however, even if that rule of deference is set aside, it is proper to interpret

Section 8(b) also to bar single parties from levying excessive charges for settlement services.

          The section can be read, with ellipses, as follows: "No person shall ... accept any portion

... of any charge made or received ... for the rendering of a real estate settlement service ... other

than for services actually rendered." Such a reading of Section 8(b) easily covers single-party

excessive charges, so long as "any portion" can include "the entire portion."

          Defendants object that the entire opening phrase, "No person shall give and no person

shall accept," belies a single-party interpretation by identifying both a giver and an accepter as

violators, but that is not a necessary result. A concurrent violation by both a giver and an

acceptor can occur, as is the case for the mark-up violations described above, if both parties keep

a portion of the excessive part of the charge. Both sides of the "and" in the phrase are given

meaning in that circumstance. But there is no rule of statutory interpretation saying that language

prohibiting misconduct by A and B means that a violation occurs only if both A and B engage in

the misconduct. In this respect, Defendants' interpretation gives undue weight to the word "and."

The Supreme Court has recognized that "[i]n the construction of statutes, it is the duty of the

court to ascertain the clear intention of the legislature. In order to do this, courts are often

compelled to construe . . . 'and' as meaning'or.'" United States v. Fisk, 70 U.S. **445, 447 (1865).**

See also United States v. Smeathers, 884 F.2d 363 (8th Cir. 1989); Bruce v. First Fed. Say. &

Loan Ass'n, 837 F.2d 712 (5th Cir. 1988); Kelly v. Wauconda Park Dist., 801 F.2d 269 (7th Cir.

1986); Peacock v. Lubbock Compress Co., 252 F.2d 892 (5th Cir. 1958).

The use of conjunctive or disjunctive language is not dispositive of the meaning of a

statute. See Bruce, 837 F.2d at 713 ("We hold that the word'and'. . . should be given a

disjunctive rather than a conjunctive meaning."); Smeathers, 884 F.2d at 363-64 ("Normally the

word 'or' connotes disjunction ... This rule of construction yields, however, when a disjunctive

reading would frustrate a clear statement of legislative intent."). In Kelly the Seventh Circuit

recognized the danger in focusing too heavily on a single word for the purpose of statutory

construction:

> [T]here are dangers in attempting to rely too heavily on
> characterizations such as 'disjunctive' form versus 'conjunctive'
> form to resolve difficult issues of statutory construction. Although
> connecting words such as 'and,' 'or,' or also are often helpful keys
> to unlocking Congress's intent, we must still look at all parts of the
> statute."

801 F.2d at 270 n. 1 . Peacock v. Lubbock Compress Co., dealt with a provision of the Fair Labor

Standards Act ("FLSA") similar to Section 8(b). Under the FLSA, overtime provisions would

not apply where an employer is engaged in the "ginning and compressing of cotton." Peacock

252 F.2d at 893-5. The Fifth Circuit determined that the statute applied to two separate actions:

> The statute, of course, says 'ginning and compressing of cotton.' If
> it is a conjunctive, the watchmen are rights, the Compress is
> wrong, and the cause must be reversed. This is so because it is
> admitted that the Compress Company is engaged exclusively in
> compressing cotton and never has engaged in the activity of
> ginning cotton or a combination of ginning and compressing.

Actually, it cuts much deeper since it is an acknowledged undisputed fact of the cotton industry that compressing is an operation entirely removed from ginning and that the two are never carried on together. To read it literally here is to read it out of the statute.

But the word 'and' is not a word with a single meaning, for chameleonlike, it takes its color from its surroundings. Nor has the law looked upon it as such. It is ancient learning, recorded authoritatively for us nearly one hundred years ago, echoing that which had accumulated in the previous years and forecasting that which was to come, that, 'In the construction of statutes, it is the duty of the Court to ascertain the clear intention of the legislature. In order to do this, Courts are often compelled to construe 'or' as meaning 'and' and again 'and' as meaning 'or.'

Id. at 893 (citation omitted)."

"No person shall give and no person shall accept" should be read - if this Court were to take on such an unnecessary task -- to comprehend a statutory violation regardless of whether single or multiple parties are involved in either giving or accepting a "portion, split or percentage" of an unearned fee."

[34] Even the Fourth Amendment to the United States Constitution, protecting against "unreasonable searches and seizures," is a conjunctive interpreted as a disjunctive. USCA CONST Amend. IV. No one doubts that an unreasonable search is unconstitutional even if there is not an accompanying seizure. See State v. Citta, 625 A.2d 1162 (N.J. Super. Ct. 1990) ("While the Fourth Amendment is couched in the conjunctive pursuant to general statutory construction principles, the proscription applies as well disjunctively to 'searches' or 'seizures.'").

[35] Defendants' insistence that there be a giver and a receiver for a violation of Section 8(b) allows them to then argue that since the borrowers, who obviously are not intended to be liable, cannot be the giver, a split of the unearned fee between the lender and a third party must be required. Defendants' reasoning is unnecessary if the "and" does not always require conjunction. The Boulware court recognized that "[it] would be irrational to conclude that Congress intended consumers to be potentially liable under RESPA by paying unearned fees." Boulware, 291 F.3d at 265. The court, however, mistakenly accepted the very interpretation of Section 8(b) that allowed for this irrational conclusion.

-33-

III.    **PLAINTIFF HAS STANDING TO MAKE
        CLAIMS AGAINST ALL THREE DEFENDANTS**

Defendants GMAC Group and GMAC Residential contend they should be dismissed

because Plaintiff has alleged a direct contractual relationship only with GMAC Mortgage and

Pennsylvania has not adopted the single enterprise theory. However, the complaint's allegations

are sufficient to hold in GMAC Group and GMAC Residential under present law.

As Defendants themselves point out, while the single enterprise theory "has yet to be

adopted in Pennsylvania," Miners, Inc. v. Alpine Equipment Cord;, 722 A.2d 691, 695 (Pa.

Super. Ct. 1998), that statement certainly does not exclude the possibility that it will, and in fact

suggests that the theory is likely to be adopted. [16]

The Third Circuit has recently acknowledged use of the single entity test, in Genesis Bio-

Pharmaceuticals, Inc. v. Chiron Corp., 27 Fed. Appx. 94, 98 (3d Cir. 2002), citing Lucas v. Gulf

---

[16]   Miners says Pennsylvania has not yet adopted the single enterprise doctrine, but the
court then proceeds to analyze the facts under the doctrine. In Philadelphia Eagles Football Club,
Inc. v. City of Philadelphia, 758 A.2d 236, 253 (Pa. Commw. Ct. 2000), a case decided two years
after Miners, the court applied the "unitary business principle" in determining whether a
multistate or multinational corporation should be taxed as one entity. Id. (citing Container Corp.
of Am. v. Franchise Tax Bd., 463 U.S. 159 (1983)). Neither Lumax Industry Inc. v. Aultmar4
669 A.2d 893 (Pa. 1995), nor Kellytown Co. v. Williams, 426 A.2d 663 (Pa. Super. Ct. 1981),
cited by Defendants, explicitly deals with the single enterprise theory. Both are alter ego cases,
which, as the Fifth Circuit holds, differs from single enterprise theory:

> An alter ego remedy is available when there is an identity or unity between
> a corporation and either a natural person or an affiliated entity such that all
> separateness between the parties has ceased (or never existed) and failure to
> disregard the corporate form would be unjust. A single business enterprise
> remedy likewise defeats the corporate form, but is appropriate when two or more
> organizations that are separate de jure pool or integrate their resources de facto to
> achieve a common business purpose. If such commonality is established, each
> constituent organization may be held liable for the debts incurred by one or more
> of the others in pursuit of that common business purpose.

Schimmelpenninck v. Byme, 183 F.3d 347, 356 (5ᵗʰ Cir. 1999) (emphasis added).

& W. Indus., Inc., 666 F.2d 800, 806 (3d Cir. 1981), abrogated on other grounds, EF Operating Corp. v. Am. Bldgs., 993 F.2d 1046 (3d Cir. 1993), as the source for factors supporting such a finding.  Here, the complaint extensively pleads satisfaction of those factors.  IT 13, 15-30.  Taking these allegations as true and construing them in the light most favorable to the plaintiff, the complaint satisfies the notice pleading requirements of Fed. R. Civ. P. 8(a)(2) and 12(b)(6) on this subject, and the allegations against all three Defendants should be sustained." If the Court believes repleading is necessary in order to amplify the allegations on this subject, Plaintiff would seek leave to amend after having the opportunity to conduct discovery of the relevant facts. See Lucas, 666 F.2d at 806 (Third Circuit reversed dismissal and remanded for further jurisdictional discovery to clarify defendants' relationships and uncover their involvement in misconduct).

## IV.   **PLAINTIFF'S STATE-LAW CLAIMS SHOULD BE SUSTAINED**

Plaintiff asserts a federal claim for violation of REPSA (Count 1), a state law claim for unjust enrichment (Count 2), and a state law claim for money had and received (Count 3). Defendants' motion to dismiss the RESPA claim should fail for the reasons described above. Because the Court has original jurisdiction over Plaintiffs federal RESPA claim, the Court may properly exercise supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a). The state law claims for unjust enrichment and money had and received depend on the same factual allegations as the federal RESPA claim and "are so related" thereto that these

" Defendants' federal case on this subject, Weiner v. Bank of King of Prussia, 358 F. Supp. 684 (E.D. Pa. 1973), is inapposite.  Weiner does not even allude to the single enterprise doctrine. In that case, plaintiff had sued 20 national and state banks, each of which was a distinct and separate entity governed by an individual charter. The federal statute on which the plaintiff relied did not even apply uniformly to all named banks.  Weiner does not so much as imply any two of these banks shared the same name, much less integrated their resources to achieve a common business purpose.

claims "form part of the same case or controversy." Id. These state law claims expressly depend

on the same factual allegations as the federal RESPA claim. Therefore, supplemental

jurisdiction exists over Plaintiff's state law claims."  Since Plaintiff's RESPA claim is sufficient,

as described above, the state law claims should also be sustained."

**CONCLUSION**

For all the foregoing reasons, Defendants' Motion to Dismiss the Complaint should be

denied.

Dated: October 25, 2002

                              **MILBERG WEISS BERSHAD**
                              **HYNES & LERACH LLP**


                              _Michael C. Spencer_

                              MICHAEL C. SPENCER
                              SUSAN M. GREENWOOD
                              One Pennsylvania Plaza
                              New York, NY 10 119
                              Telephone: (212) 594-5300
                              Facsimile: (212) 868-1229


[s]  Although the complaint alleges only federal question jurisdiction under 28 U.S.C. §
1367 and supplemental jurisdiction under 28 U.S.C. § 1367(a), Defendants devote more than two
pages to refuting diversity of citizenship jurisdiction.  Although the present complaint does not
allege diversity jurisdiction, Plaintiff notes that certiorari has been granted on the issue of
whether the cost to a defendant of injunctive relief in a class action lawsuit can be considered in
determining the amount in controversy for diversity jurisdiction.  Ford Motor Co. v. McCauley,
264 F.3d 952 (9th Cir. 2002), cent granted in part, 122 S. Ct. 1063 (Feb. 19, 2002). Because
Plaintiff is seeking injunctive relief in his complaint, he reserves the right to amend the complaint
to allege diversity of citizenship jurisdiction if the United States Supreme Court permits
consideration of the administrative costs of injunctive relief to satisfy the amount in controversy
requirement.

" Even if the Court were to dismiss Plaintiff's federal RESPA claim, the Court would
possess almost absolute discretion to retain jurisdiction over the state law claims.  Annulli v.
Panikkar, 200 F.3d 189, 202 (3rd Cir. 1999) ("This administrative decision is left to the sound
decision of the district court, and we review such determination for an abuse of discretion ...... ).

-36-

**MILBERG WEISS BERSHAD**
  **HYNES & LERACH LLP**
JOHN J. STOIA, JR.
TIMOTHY G. BLOOD
HELEN I. ZELDES
401 B Street, Suite 1700
San Diego, CA 92 101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

**PACKARD, PACKARD & JOHNSON**
CRAIG H. JOHNSON
LON D. PACKARD
JOANN SHIELDS
2795 Cottonwood Parkway, Suite 600
Salt Lake City, UT 84121
Telephone: (801) 428-9000
Facsimile: (801) 428-9090

VON G. PACKARD
RONALD D. PACKARD
JACQUETTA BARDACOS
Four Main Street, Suite 200
Los Altos, CA 94022
Telephone: (650) 947-7300
Facsimile: (650) 947-7301

**NIX, PATTERSON & ROACH**
CARY PATTERSON
NELSON ROACH
BRADY PADDOCK
MICHAEL ANGELOVICH
2900 St. Michael Drive, 5th Floor
Texarkana, TX 75503
Telephone: (903) 223-3999
Facsimile: (903) 223-8520

**THE LAW OFFICES OF MICHAEL E.**
  **HUBER**
MICHAEL E. HUBER
8170 S. Highland Drive, Suite E5
Sandy, UT 84093
Telephone: (801) 733-5807
Facsimile: (801) 733-0132

BARRACK, RODOS & BACINE
LEONARD BARRACK
DANIEL E. BACINE
JEFFREY W. GOLAN
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Susan M. Greenwood, certify that on the 25th day of October, 2002,1 caused true and

correct copies of Plaintiff s Memorandum In Opposition To Defendants' Motion To Dismiss to be

served upon the following:

VIA FEDERAL EXPRESS

Robert A. Nicholas, Esq.
REED SMITH LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Susan M. hreenwood