IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRANCIS SANTIAGO, | : |
| Plaintiff, | : Civil Action No. 02-4048 |
| v. | : |
| GMAC MORTGAGE GROUP, INC., GMAC RESIDENTIAL HOLDING CORP., and GMAC MORTGAGE CORPORATION, | : |
| Defendants. | : |

### AFFIDAVIT OF LINDA NAYLOR

I, Linda Naylor, being duly sworn, state that at all times relevant to the above-captioned action, the following facts are true and correct to the best of my personal knowledge, information and belief:

1.  I am Senior Vice President, Retail Operations, for GMAC Mortgage Corporation ("GMACM").

2.  I have reviewed the loan file of Francis Santiago, as well as the following contracts: the Master Services Agreement between GMACM and Home Connects Lending Services, LLC ("HCLS"), effective December 15, 2005 (the "GMACM Master Services Agreement"); the Master Services Agreement between GMACM d/b/a ditech.com and HCLS, effective January 1, 2006 (the "GMACM-Ditech Master Services Agreement"); the First American Flood Data Services, Inc., Flood Zone Determination Agreement, effective November 1, 1995; and the Addendum No.1 to First American Flood Data Services, Flood Zone Determination Service Agreement, dated September 1, 2000.



3. As reflected in the HUD 1, Mr. Santiago did not pay a tax service fee or a flood certification fee, or a funding fee. These fees were paid by the broker, not Mr. Santiago, outside of closing.

4. The broker paid $85 for the tax service, which was the same amount ($85) that GMACM paid to HCLS for the tax service. The broker also paid a $250 funding fee and a $20 flood certification fee.

5. GMACM did not charge Francis Santiago for underwriting, and Mr. Santiago did not pay any underwriting fee. The $250 funding fee, which was paid by the broker, was not an underwriting charge. The $250 funding fee was for GMACM services performed in connection with the loan, which consisted of validating the wire instructions, inputting the wire instructions into the system of record, sending the wire, providing federal reference numbers, reviewing closing documents and conducting a quality control review of the file.

6. As mentioned above, HCLS performed the tax service contract in connection with the Santiago mortgage loan, made January 24, 2002. HCLS is the third-party vendor that GMACM currently uses exclusively to provide tax service contracts and flood determinations to borrowers obtaining loans from GMACM and its affiliates.

7. In spite of its best efforts, GMACM has been unable to locate and does not believe a written agreement exists between GMACM and HCLS for any time period prior to December 15, 2005, except for the Flood Services Agreement between GMACM d/b/a ditech.com and HCLS, entered into as of October 1, 2002, which I have also reviewed. The contractual price paid by GMACM to HCLS for tax service contracts and flood determinations has always been the same price per loan as itemized in the "Pricing Schedule," which is set forth in Exhibit D to the GMACM Master Services Agreement and Exhibit C to the GMACM-Ditech Master Services Agreement.


CONFIDENTIAL

8. I am also familiar with GMACM's mortgage operations, including the various business channels through which GMACM originates mortgage loans.

9. At the time of Francis Santiago's loan on January 24, 2002, GMACM had four business channels which originated mortgage loans, and they were commonly referred to as Retail, Direct, GMACM d/b/a ditech.com ("Ditech"), and Business Lending ("Broker").

10. The Retail and Direct channels were in existence on or before 1995. The Broker channel was created in 1999, and the Ditech channel was created in 2000.

11. The following information pertains to flood certifications and tax service contracts obtained by the four business channels between 1995 and the present, and the fees charged by GMACM during this time frame.

   a. For the Retail, Direct, and Ditech channels, borrowers were generally charged the same amount that GMACM paid the third-party vendor to provide the flood certification and tax service. Borrowers were sometimes not charged a fee for these services, or were charged an amount less than the contractual amount GMACM paid to the third-party vendor. Borrowers generally were not charged more than the contractual amount GMACM paid to the third-party vendor.

   b. In the Broker channel, created in 1999, borrowers were generally charged the same amount that GMACM paid the third-party vendor to provide the tax service. Borrowers were sometimes not charged a fee for this service, or were charged an amount less than the contractual amount GMACM paid to the third-party vendor. Borrowers generally were not charged more than the contractual amount GMACM paid to the third-party vendor. With respect to flood certifications, borrowers were generally charged a fee of $20 for a flood certification, which is an amount that is more than the contractual amount GMACM paid to the third-party vendor. Borrowers were sometimes not charged a fee for this service. Beginning in



September 2005, borrowers were no longer charged $20 for a flood certification; rather, borrowers were generally charged the same amount that GMACM paid the third party vendor to provide the flood certification.

    c.    The total number of loans closed by the Broker channel of GMACM from 1999 to the end of August, 2005 was 83,501. There were no brokered loans prior to 1999.

    d.    From 1999 to 2001, the Broker channel originated a total of 10,257 loans. First American would have issued flood certifications for these brokered loans at a contractual rate of $11/flood certification.

    e.    In 2002, the Broker channel originated a total of 15,520 loans. First American would have issued flood certifications for no more than one-third of these brokered loans at a contractual rate of $11/flood certification. This is because the Broker channel began using HCLS to issue flood certifications in late February of 2002. HCLS would have issued flood certifications for the remainder of the 2002 brokered loans at a contractual rate of $19/flood certification.

    f.    From 2003 until the end of August, 2005, the Broker channel originated a total of 57,724 loans. HCLS would have issued flood certifications for these loans at a contractual rate of $19/flood certification.

_____
Linda Naylor

-4-

CONFIDENTIAL

SWORN TO AND SUBSCRIBED before me this 13th day of July, 2006, by Linda Naylor who is personally known to me or who has produced _____ as identification and who did take an oath. If no type of identification is indicated, the above-named person is personally known to me.



*Lisa M. Jones*
Signature of Notary Public
Lisa M. Jones
Print Name of Notary Public
I am a Notary Public of the State of Pennsylvania, and my commission expires on 1-12-2008.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Lisa M. Jones, Notary Public
Horsham Twp, Montgomery County
My Commission Expires Jan. 12, 2008
Member, Pennsylvania Association Of Notaries





-5-

